## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                    No.  CR-02-2038 MV

RAYMOND JOHNSON,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Raymond Johnson's Motion to Suppress **[Doc. No. 26]**, filed January 6, 2003.  The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, ruled at the motion hearing that the motion would be **GRANTED**.  The Court now sets forth the bases for its prior ruling in this Memorandum Opinion.

## BACKGROUND

At 3:41 p.m. on October 24, 2002, Albuquerque Police Officer Robert Middleton received a "suspicious person" call from dispatch reporting that a black male adult was pushing a white female juvenile by the shoulder, forcing her to walk southbound on Pennsylvania Avenue.  Dispatch described the black male adult as thin, 35 years old, five feet nine inches tall with short, curly hair and wearing a white jacket with red "USA" lettering and green jeans.  The white female juvenile was described as 12 years old, five feet nine inches tall with long blonde hair and wearing blue jeans and a green jacket with the hood over her head.  Their location was in the Southeast section of Albuquerque, which Officer Middleton described during the motion hearing as the "War Zone." According to Officer Middleton, this is the area in which most Albuquerque arrests occur, and the police have heightened safety concerns there due to the prevalence of drugs and weapons.

As dispatch made clear, the description of the subjects was based on a tip from an anonymous source.  The tipster had called the police from his cellular telephone as he was driving in his car observing the subjects.  He had reported to dispatch that the black adult male was "making" a "really white girl" walk with him, that he was "yelling at her," that he "had her by the shoulder," that he was "sure looking for something" and that the girl seemed "scared."  When asked by dispatch whether he saw any weapons, the tipster replied that he did not.  The tipster gave dispatch his cellular telephone number, but did not disclose his name or address.

As he was the officer nearest to the subjects' location, Officer Middleton responded to the call.  Approximately three minutes after receiving the call, Officer Middleton spotted Defendant and a girl who matched the descriptions that dispatch had provided.  The girl later identified herself to another officer, Officer Duren, as Samantha D. and told Officer Duren that she was 15 years old.[1] As he approached the subjects, Officer Middleton observed Defendant and Samantha for approximately 100 yards.  He testified that he did not see Defendant touch Samantha in an aggressive manner and that, in fact, had it not been for the call from dispatch, nothing in the interaction that he observed between Defendant and Samantha would have aroused his suspicion.

Officer Middleton parked his patrol car, approached Defendant and Samantha, identified himself as a police officer and stated that he had received a call that Defendant "was pushing her around."  Officer Middleton asked Samantha whether she was okay, and whether she had been pushed.  Samantha replied that she was fine and that she had not been pushed.  According to Samantha's testimony, the idea that Defendant had pushed her was so "ridiculous" that she "just

---

[1]At the motion hearing, Samantha D. testified that she had given Officer Duren a false name as she was a runaway and was afraid of being caught.  She testified that her actual name is Beth Ann N.  For purposes of consistency, the Court refers to her herein as "Samantha."

laughed." According to Officer Middleton's testimony, there was nothing in Samantha's demeanor to suggest that she had been pushed or that she was in any distress: she bore no bruises, was not crying and her clothing did not look disheveled but rather was appropriate for the weather and the day. While he was talking to Samantha, Officer Middleton observed Defendant holding a walkie-talkie and pressing down on the transmission or microphone button, acting "fidgety" and looking "left and right."

Officer Duren then arrived at the scene, and Officer Middleton instructed Samantha to wait with Officer Duren while he talked separately to Defendant. Officer Middleton instructed Defendant to come stand next to his police car and to put down the walkie-talkie that he was holding. Defendant complied. Officer Middleton asked Defendant for his identification, and Defendant handed him a license or an identification card. Officer Middleton did not return the identification to Defendant, but rather either held it in his hand or placed it on top of his patrol car. Defendant asked Officer Middleton about the source of the call he received, and Officer Middleton informed him that it was an anonymous call. Defendant told Officer Middleton that the allegations were "crazy," and that he had not done anything to Samantha. Defendant denied that anything had happened and denied the validity of the call.

At that point, Officer Middleton advised Defendant that he was going to pat him down for weapons. Defendant informed Officer Middleton that he had a gun and made a gesture indicating that it was on his right side. Officer Middleton instructed Defendant to turn away from him and conducted a pat-down search during which he found the gun. Officer Middleton removed the gun from Defendant's belt and placed Defendant in handcuffs. Thereafter, Officer Middleton asked Defendant whether he had ever been arrested for a felony. Defendant replied that he had.

-3-

At the motion hearing, Officer Middleton described Defendant's demeanor throughout the stop as cordial, nice and gentlemanly.  Officer Middleton testified that Defendant was "very compliant": he did not reach for his gun or make any threatening moves toward him but rather was "actually kind of nice" to disclose that he had a gun.  In addition, Officer Middleton testified that neither he nor Officer Duren ever discovered any evidence confirming the anonymous tip that Defendant was pushing Samantha.

On November 15, 2002, Defendant was indicted on one count of felon in possession of a firearm and ammunition **[Doc. No. 9]**.  On January 6, 2003, Defendant filed a motion to suppress **[Doc. No. 26]**, stating that Officer Middleton did not have reasonable suspicion to conduct a pat-down search of Defendant and that, as a result, the .22 caliber pistol seized from Defendant during that search must be suppressed.  The Government filed its response in opposition on March 10, 2003 **[Doc. No. 39]**.  On May 27, 2003, the Court held an evidentiary hearing on the motion to suppress.  At the completion of the hearing, as set forth below, the Court granted the motion.

## DISCUSSION

In *Terry v. Ohio*, the Supreme Court recognized that "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience."  392 U.S. 1, 24-25 (1968).  At the same time, the Supreme Court acknowledged "the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest."  *Id.* at 24.  In balancing an individual's constitutional rights with law enforcement safety concerns, the Supreme Court concluded "that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where

he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id.* at 27.  Accordingly, the Supreme Court in *Terry* authorized "a limited patdown for weapons where a reasonably prudent officer would be warranted in the belief, based on 'specific and articulable facts,' that he is dealing with an armed and dangerous individual.'" *Maryland v. Buie*, 494 U.S. 325, 332 (1990) (citations omitted).  The officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citations omitted).  "The Fourth Amendment requires 'some minimal level of objective justification' for making the stop." *Id.* (citations omitted).  Whether there is a sufficient basis to justify a pat-down search depends on "the totality of the circumstances -- the whole picture." *Id.* at 8.

Under *Terry*, an investigative detention or a protective search comports with the Fourth Amendment only if the officer's action "was justified at its inception . . . and was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20.  An investigative detention is justified at its inception where the officer has "an articulable and reasonable suspicion that the person detained is engaged in criminal activity." *United States v. King*, 990 F.2d 1552, 1557 (10th Cir. 1993).  For a warrantless, pat-down search to be justified at its inception, "the officer must not only harbor an articulable and reasonable suspicion that the person is armed and dangerous, the officer must also be 'entitled to make a forcible stop.'" *Id.* (citation omitted).  Further, "reasonable suspicion must exist at all stages of the detention." *United States v. Soto-Cervantes*, 138 F.3d 1319, 1322 (10th Cir. 1998), *cert. denied*, 525 U.S. 853 (1998).  Once the concern that justifies an initial stop is dispelled, any further detention will violate the Fourth Amendment. *See Id.*

-5-

In the instant case, Officer Middleton conducted an investigatory stop of Defendant based upon an anonymous tip.  Accordingly, the first issue which this Court must address is whether the anonymous tip provided a particularized, articulable and reasonable suspicion that Defendant was engaged in criminal activity, therefore justifying the stop.  In *Alabama v. White*, 496 U.S. 325 (1990), the Supreme Court recognized that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (citing *White*, 496 U.S. at 327).  In *White*, the police received an anonymous tip asserting that a woman was carrying cocaine and predicting that she would leave an apartment building at a specified time, get into a car matching a particular description, and drive to a named motel.  The Supreme Court explained that the tip alone would not have justified a *Terry* stop, and that only after police observation showed that the informant had accurately predicted the woman's movements did it become reasonable to think the tipster had inside knowledge about the suspect and therefore credit his assertion about the cocaine.  Although the Supreme Court held that the suspicion in *White* became reasonable after police surveillance, it regarded the case as "borderline," and "classified *White* as a 'close case.'"  *J.L.*, 529 U.S. at 271 (citing *White*, 496 U.S. at 331).

The Supreme Court again addressed the issue of an anonymous tip in *Florida v. J.L.*  In *J.L.*, an anonymous caller reported to the police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun.  Two officers responded to the tip and saw three black males at the bus stop.  Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct.  The officers did not see a firearm, and J.L. made no threatening or otherwise unusual

movements.  One of the officers approached J.L., told him to put his hands up on the bus stop, frisked

him, and seized a gun from his pocket.

The Supreme Court held that the tip in *J.L.*:

> lacked the moderate indicia of reliability present in *White* and essential
> to the Court's decision in that case.  The anonymous call concerning
> J.L. provided no predictive information and therefore left the police
> without means to test the informant's knowledge or credibility.  That
> the allegation about the gun turned out to be correct does not suggest
> that the officers, prior to the frisks, had a reasonable basis for
> suspecting J.L. of engaging in unlawful conduct: The reasonableness
> of official suspicion must be measured by what the officers knew
> before they conducted their search.

*Id.* at 271.  The *J.L.* Court further stated that while a tip describing a subject's location and

appearance is reliable in helping the police to correctly identify the person whom the tipster means

to accuse, "[s]uch a tip . . . does not show that the tipster has knowledge of concealed criminal

activity.  The reasonable suspicion here at issue requires that a tip be reliable in its assertion of

illegality, not just in its tendency to identify a determinate person."  *Id.* at 272.

Based on the standards set forth by the Supreme Court in *White* and *J.L.*, the anonymous tip

dispatched to Officer Middleton does not exhibit sufficient indicia of reliability to have provided

reasonable suspicion for the investigatory stop of Defendant.  First, the descriptions provided by the

anonymous tipster did no more than simply identify Defendant and Samantha.  Although the tipster

followed Defendant and Samantha for quite some time as he was talking to dispatch on his cellular

telephone, his contemporaneous examination did not reveal any significant criminal activity.  The

tipster never indicated that he saw Defendant hurting Samantha, or that Samantha was being pushed

or struck.  Instead, the tipster's report was that a black adult male was "making" a "really white girl"

walk with him, that he was "yelling at her," that he "had her by the shoulder," that he was "sure

looking for something" and that the girl seemed "scared." This information fails to rise to the level of demonstrating that the tipster had knowledge of criminal activity. Accordingly, the tip was not "reliable in its assertion of illegality" and thus was insufficient to form the basis of reasonable suspicion. *J.L.*, 529 U.S. at 272.

Moreover, there was no independent corroboration of the tipster's report of Defendant's allegedly improper conduct. In fact, the 100 yards of observation by Officer Middleton disproved the contents of the tipster's report with regard to any such improper conduct. Officer Middleton saw no pushing or shoving or any kind of aggressive conduct by Defendant. Indeed, Officer Middleton testified that, but for the report from dispatch, he would have had no reason to suspect Defendant of illegal conduct. Because Officer Middleton's own observation failed to confirm the accuracy of the anonymous report, it was unreasonable to credit the tipster's assertions regarding Defendant's conduct. *See White*, 496 U.S. at 332. The anonymous tip, without independent corroboration, thus was insufficient to form the basis of reasonable suspicion. *See Id.*

Further, the only corroboration that exists in this case is as to the identifying characteristics of the subjects. In matching Defendant and Samantha to the descriptions provided by dispatch, Officer Middleton did no more than corroborate the non-predictive information provided by the anonymous tipster. Corroboration of such non-predictive information is insufficient to establish reasonable suspicion, which requires that a "tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272.

Assuming *arguendo* that the anonymous tip provided reasonable suspicion justifying the initial stop of Defendant, such reasonable suspicion was dispelled after Officer Middleton's initial contact with Defendant and Samantha. Officer Middleton did not identify any injuries, disheveled clothes,

crying, or any other signs that Samantha had been pushed or was in any distress.  There was no testimony that Samantha was or appeared to be frightened of Defendant.  Defendant did not demonstrate any aggressive behavior either toward Samantha or the officers.  To the contrary, Officer Middleton described Defendant's behavior as gentlemanly, cordial, nice and compliant.  Moreover, Defendant and Samantha appeared genuinely surprised when they learned about the report that Defendant allegedly had been pushing or shoving Samantha.  In fact, each party separately indicated to Officer Middleton that there had been no pushing or shoving.  Thus, any concern that Officer Middleton may have had at the inception of the stop was dispelled through both his own observation of Defendant and Samantha and their separate statements to him.  Under these circumstances, the continued detention of Defendant violated the Fourth Amendment.

Finally, the pat-down search of Defendant was not justified.  As set forth above, any possible reasonable suspicion had been dispelled by the time Officer Middleton advised Defendant that he was going to search him for weapons.  Accordingly, at that point, Officer Middleton was not "entitled to make a forcible stop." *Soto-Cervantes*, 138 F.3d at 1322.  On this basis alone, Officer Middleton was constitutionally prohibited from conducting a pat-down search of Defendant.

Not only was there no longer any reasonable suspicion that Defendant was engaged in criminal activity, but also there was no basis to suspect that Defendant was "armed and dangerous." *Id.*  Police dispatch specifically asked the anonymous tipster whether he had seen Defendant with a weapon, and the tipster stated that he had not.  Officer Middleton himself did not observe any weapons, either as he was approaching Defendant and Samantha or at any time thereafter during his interactions with Defendant.  Officer Middleton testified that both of Defendant's hands were visible at all times, that the only thing Defendant had in his hands was the walkie-talkie and that he was

certain from the beginning that the walkie-talkie was not a weapon.  In fact, the only evidence indicating that Defendant was armed was his own statement that he had a gun.  Defendant, however, did not make this statement until after Officer Middleton had already advised him that he was going to conduct a pat-down search.  Accordingly, his statement cannot be considered in determining reasonable suspicion.  *See United States v. Hall*, 978 F.2d 616, 621 (10th Cir. 1992).

Nonetheless, the Government asks the Court to ignore the absence of evidence of a weapon and find that Officer Middleton had reasonable suspicion to conduct a pat-down search.  The Government argues that the following factors created a reasonable suspicion that Defendant was armed and dangerous: (1) Defendant appeared to be nervous, acting "fidgety" and looking "left and right"; (2) Defendant appeared to be making communication with his walkie-talkie and, in Officer Middleton's experience, drug dealers in the neighborhood often used walkie-talkies; and (3) Defendant was in a dangerous area where police have heightened safety concerns due to the prevalence of drugs and weapons.

First, with regard to Defendant's nervous appearance, the Tenth Circuit has "repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on nervousness . . . 'must be treated with caution.'" *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998) (citations omitted); *see also Hall*, 978 F.2d at 622 n.4 ("[W]e are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials.").  This is so because "[i]t is common knowledge that most citizens . . . whether innocent or guilty, when confronted by a law enforcement officer who asks them potentially incriminating questions are likely to exhibit some signs of nervousness."  *United States v. Millan-Diaz*, 975 F.2d 720, 722 (10th Cir.

1992).  Accordingly, "absent signs of nervousness beyond the norm," the Court "will discount the detaining officer's reliance on the detainee's nervousness as a basis for reasonable suspicion." *Salzano*, 158 F.3d at 1113.  Here, the only evidence of Defendant's nervousness is Officer Middleton's testimony that Defendant was acting "fidgety" and looking "left and right."  This evidence is insufficient to show that Defendant exhibited any "signs of nervousness beyond the norm." *Id.*  It is entirely normal for an individual who has been stopped by a police officer and advised that he is suspected of criminal activity to look around in order to see who might have accused him or to see who is watching "what must surely be an annoying, frightening, and perhaps humiliating experience." *Terry*, 392 U.S. at 24-25.  Moreover, while Defendant may have appeared nervous, his behavior was not evasive.  This is underscored by Officer Middleton's testimony that even though he appeared nervous, Defendant "was still acting as a gentleman."  Based on all of the relevant testimony, Defendant's behavior simply does not rise to the level of "nervous, evasive behavior" which has been considered in other cases to be "a pertinent factor in determining reasonable suspicion."  *See Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000) (holding that defendant's unprovoked flight upon noticing the police constituted nervous, evasive behavior sufficient to justify officer in suspecting criminal activity); *United States v. Harris*, 313 F.3d 1228 (10th Cir. 2002), *cert. denied*, 123 S. Ct. 1380 (2003) (holding that where defendant acted nervous *and* refused to take his hands out of his pockets after officer requested that he do so, defendant's nervous, evasive behavior created reasonable suspicion that defendant was armed and dangerous).

Next, with regard to Officer Middleton's concern that Defendant appeared to be communicating with someone via his walkie-talkie, Officer Middleton acknowledged the lack of any particularized basis reasonably to suspect that Defendant was in the process of such a communication.

Officer Middleton testified only to a generalized *feeling* that "people" carrying walkie-talkies are "either transmitting what's going on to other people, . . . or there is somebody else out there watching us . . . on the other end of that frequency."  With regard to this particular situation, however, Officer Middleton testified that he "did not know if Defendant was actually calling somebody or not."  In fact, Officer Middleton testified that Defendant never picked the walkie-talkie "up towards his face" and that he never heard anybody speaking back to Defendant on the walkie-talkie.  Officer Middleton's suspicion of Defendant thus was not based upon his actual observation of Defendant but rather upon his perception as an experienced police officer.  "Absent a specific and articulable factual basis, [however,] an officer's 'perception' is nothing more than 'an inchoate and unparticularized suspicion or hunch'" insufficient to justify a pat-down search. *United States v. Davis*, 94 F.3d 1465, 1469 (10th Cir. 1996) (holding that officer's suspicion of defendant who kept his hands in his coat pockets was insufficient as it was based on officer's perception after ten years on the police force rather than on any particularized factual basis).  Thus, Defendant's handling of the walkie-talkie cannot be considered a contributing factor to the reasonable suspicion determination.

The only remaining factor identified by the Government is the dangerousness of the area in which the stop occurred.  The law is clear that "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted."  *Buie*, 494 U.S. at 334 n.2.  While "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis, . . . [a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularlized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124 (finding reasonable suspicion justified because defendant was in an area of heavy

narcotics trafficking *and* because of defendant's "headlong flight – . . . the consummate act of evasion" upon noticing police).   To adopt the position that the dangerousness of Southeast Albuquerque is in itself an independent factor sufficient to justify the pat-down search effectively would eviscerate the meaning of *Terry*.   As set forth above, neither of the other two factors relied upon by the Government helps to establish reasonable suspicion.   There thus are no other "relevant contextual considerations" supporting the Government's argument.   *Wardlow*, 528 U.S. at 124. Under these circumstances, the fact that the stop occurred in a dangerous area cannot serve as justification for the pat-down search of Defendant.

The factors identified by the Government thus fall far short of adding up to specific and articulable facts which would have warranted a reasonably prudent officer to believe that he was dealing with an armed and dangerous individual.   *See Buie*, 494 U.S. at 332.   Consideration of the pat-down search in the context of the stop as a whole confirms this conclusion.   By the time Officer Middleton advised Defendant that he was going to search him for weapons, Samantha and Defendant independently had informed him that Defendant did not push Samantha, that nothing happened between them and that Samantha was fine.   Moreover, Officer Middleton had already had the opportunity to observe Defendant and Samantha and, based upon his own observations, had determined that there was nothing out of the ordinary in their interaction, that Samantha appeared unhurt, that Defendant's behavior was neither violent nor threatening and that there was no evidence of a weapon.   In fact, by this point, Officer Middleton had developed a distinctly favorable impression of Defendant as a gentlemanly, nice, cooperative man.   Under this totality of the circumstances, Defendant's apparent nervousness, his handling of the walkie-talkie and the dangerousness of his location do not amount to the reasonable and articulable suspicion necessary to justify the protective

-13-

frisk of Defendant.  *See United States v. Mitchell*, 61 Fed. Appx. 616 (10th Cir. 2003) (unpublished opinion) (holding that facts that defendant was present in high crime area, was a shoplifting suspect and had dropped his jacket to the floor within arm's reach did not give officer reason to believe he was dealing with an armed and dangerous individual, as defendant had taken no action that caused officer to fear for his safety, was cooperative, polite and non-threatening and was not wearing clothing containing bulges suggestive of weapons); *United States v. Davis*, 94 F.3d 1465 (10th Cir. 1996) (holding that where there was no evidence that officers spotted suspicious bulge in defendant's coat pockets, that defendant appeared to be hiding anything in his pockets, that a tipster informed police that defendant was armed or carrying drugs or that defendant made any threatening move toward officers, officers lacked reasonable, articulable suspicion that defendant was armed and dangerous).

Accordingly, Officer Middleton did not "harbor an articulable and reasonable suspicion that [Defendant was] armed and dangerous."  *Soto-Cervantes*, 138 F.3d at 1322.  Moreover, as set forth above, at the time of the pat-down search, Officer Middleton was not "entitled to make a forcible stop."  *Id.*  The pat-down search of Defendant thus did not comport with the Fourth Amendment. Consequently, the gun seized from Defendant during that search must be suppressed.

## **CONCLUSION**

The uncorroborated, anonymous tip that Defendant was pushing Samantha was insufficient to provide reasonable suspicion for the initial stop of Defendant.  Assuming *arguendo* that reasonable suspicion for the initial stop existed, any such reasonable suspicion was dispelled by Officer Middleton's initial contact with Defendant and Samantha, and the continued detention of Defendant thus was unconstitutional.  Finally, the pat-down search of Defendant did not comport with the Fourth Amendment, as it was not based on a reasonable suspicion that Defendant was armed and

dangerous, and was conducted after any possible reasonable suspicion of criminal activity had been

dispelled.  Accordingly, the .22 caliber pistol seized from Defendant during the pat-down search must

be suppressed.

     **IT IS THEREFORE ORDERED** that Defendant Raymond Johnson's Motion to Suppress

Evidence  **[Doc. No. 26]** is hereby **GRANTED**.

     Dated this 11th day of June, 2003.


_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

<u>Attorney for Plaintiff</u>:
David Walsh
Louis Valencia

<u>Attorney for Defendant</u>:
Richard Winterbottom